HERMAN W. FISCHER, PLAINTIFF-APPELLANT, v. TOWN-SHIP OF BEDMINSTER, IN THE COUNTY OF SOMER-SET AND STATE OF NEW JERSEY, A MUNICIPAL COR-PORATION, DEFENDANT-RESPONDENT.

Argued December 8, 1952—Decided December 22, 1952.

196

*Mr. Edward Sachar* argued the cause for the appellant.

*Mr. T. Girard Wharton* argued the cause for the respondent (*Mr. Leon Gerofsky* and *Messrs. Wharton, Hall, Stewart & Halpern*, attorneys; *Mr. William T. Stewart, Jr.*, on the brief).

The opinion of the court was delivered by

VANDERBILT, C. J.   The plaintiff's attack on the zoning ordinance of the defendant township resulted in a judgment in favor of the township.   The plaintiff appealed to the Appellate Division of the Superior Court and we have brought the matter here on our own certification.

To understand the controversy it is essential to get a clear picture of the defendant township which was founded by royal charter in 1749.   While it has an area of 26 square miles and is therefore more extensive than Newark, the largest city in the State, with its 23.57 square miles, it has a population of only 1,613 in comparison with Newark's 437,-857.   It is distinctly a rural community with no industry, light or heavy, and with little commercial activity, it being

stipulated in the pretrial order that "for most items, the residents shop outside the township." There are four "villages" within the township, Pluckemin, Pottersville, Lamington and Bedminster village, and curiously enough the language used in Gordon's *Gazetteer of New Jersey* to describe the township and its villages in 1834 is largely applicable 118 years later. Thus the township is characterized as "hilly," as distinguished from "level" Bridgewater to the southeast and from "mountainous" Bernards to the northeast; its population in 1830 was 1,453. *Gazetteer* 240. By turning the pages of the *Gazetteer* one may find scores, if not hundreds, of other communities within a relatively few miles of the metropolis in which there has been no appreciable growth in 120 years, due generally to the lack of adequate railroad transportation. *Lane, From Indian Trail to Iron Horse* (Princeton, 1939), *passim.* The soil is described in the *Gazetteer* as "lime, clay, and red slate, generally well cultivated and fertile," *p.* 98. Pluckemin is characterized as containing "1 tavern, 2 stores and from 25 to 30 dwellings," *p.* 218; Pottersville, "a tavern, store and a few dwellings," *p.* 220; Lamington, "a Presbyterian church, a tavern and 3 or 4 dwellings, situate in a pleasant fertile country," *p.* 167—all of them not too inaccurate descriptions today.

The pretrial order stipulates that the township consists of "rolling countryside divided into a naturally wooded area, farms and country establishments," that there are 457 families in the township, four churches, five cemeteries, three elementary schools (high school students going to Bernardsville), three post offices (some residents being served by post offices outside the township or by rural delivery from Somerville, the county seat), 55.3 miles of road (6.5 miles of state highways, 12 miles of county roads and 36.8 miles of municipal roads, of which 28.8 are unimproved stone and dirt roads), and 25 businesses, consisting of four grocery stores, four gas stations, three garages, two general stores, two saddle and harness stores, two inns, two real estate offices, an undertaker's establishment, a plumber's shop, a toy train store, a

gift shop, an upholstery shop, and a custom farming and trucking establishment. The township has one full-time police officer and several part-time special officers, but no fire department of its own, contributing to the Union Hose Company of Far Hills. Only a relatively small part of the township has a public water supply system. There is no public sewerage system. Sewage disposal presents a problem because of the large amount of shale in the soil which hampers drainage. A site for a sewage disposal plant has been acquired by the township in Bedminster Center. There is no public transportation system in the township, railroad transportation being provided from Far Hills to the east of the township or from Somerville to the south. In short, the township, although only 40 miles from New York, is as essentially rural as if it were 400 miles away, as its population of 62 per square mile demonstrates.

The surrounding municipalities are all likewise rural in character. To the north lies the township of Chester in Morris County with 27.7 square miles and a population of 1,298; and to the east the borough of Peapack and Gladstone with 5.4 square miles and a population of 1,459, the township of Bernards with 24.3 square miles and a population of 7,472, and the borough of Far Hills with 4.9 square miles and a population of 574; to the southeast the township of Bridgewater with 32.7 square miles with a population of 3,253 (with a large area devoted to industry on its southern border remote from Bedminster) ; to the southwest the township of Branchburg with 20.4 square miles and a population of 1,955; and to the west the township of Readington in Hunterdon County with 26.5 square miles and a population of 4,075, and the township of Tewksbury in Hunterdon County with 17.5 square miles and a population of 1,451.

In 1946, following a report of its zoning commission and the holding of public hearings, the township adopted a zoning ordinance dividing the township into three zones: an "A" residence zone in which no residence may be constructed upon a plot less than one-half acre; a "B" residence zone

in which no residence may be constructed upon a plot of less than five acres; and a business zone. At the time of the adoption of the ordinance the average size of each parcel of land in the "A" residence zone was about 10½ acres; the average size of each parcel in the "B" residence zone about 104 acres. About 3½ square miles were included in the "A" zone and approximately 22 square miles in the "B" zone, the business zone being located in areas within the "A" zone.

At the time the zoning ordinance was adopted the plaintiff's mother, Emilie B. Fischer, owned a tract of about 24 acres in the township, about half of which was in the "A" zone and half in the "B" zone. The plaintiff owned no property in the township at the time of the adoption of the ordinance, but almost three years thereafter, in September 1949, his mother conveyed to him about five-eighths of an acre of vacant and unimproved land located on an improved blacktop road in that portion of her property which was in the "B" or five-acre zone. Immediately after the conveyance the plaintiff instituted this action challenging the validity of the ordinance. The township moved for summary judgment and a dismissal of the complaint on jurisdictional grounds, contending that the plaintiff was barred by his failure to institute proceedings in lieu of a prerogative writ within the time prescribed by R. S. 2:80–7. This motion was denied by the trial court and affirmed on appeal by the Supreme Court, on the ground that the statute was unconstitutional, *Fischer v. Township of Bedminster*, 5 *N. J.* 534 (1950). At the trial following the remand from the Supreme Court the trial court held that the challenged parts of the ordinance were valid, and this appeal questions its judgment dismissing the complaint.

The plaintiff's primary contention here is that the provisions of Article VII of the zoning ordinance are arbitrary and unreasonable, depriving him of the use of his property without just compensation and without due process of law contrary to the requirements of the Constitutions of the United States and of this State, in that no building shall

be constructed, reconstructed, or altered in the "B" residential zone on a plot with an area of less than five acres or a width of less than 200 feet, or so as to be nearer than 100 feet to the line of any street on which the plot may abut or front. Although the plaintiff thus stated his point broadly to cover the 200-feet and 100-feet provisions of Article VII of the zoning ordinance, nowhere in his brief does he discuss these points nor did he mention them at the oral argument. His attack was confined to the five-acre provision of Article VII, and that part only of the ordinance will therefore be considered. The defendant, on the other hand, contends that even this issue is not properly before us in that the plaintiff did not question the constitutionality of the five-acre requirement in the "B" residence zone in his complaint nor did he do so in the "more definite statement" of his claim required by court order on the defendant's motion. There he alleges that he is injured by the fact that his tract of five-eighths of an acre carved out of his mother's 24-acre tract has been put in the "B" or five-acre residence zone instead of in the "A" or one-half-acre zone. The defendant contends that in the pretrial order the issue is limited to the unconstitutionality of the provisions of the ordinance "insofar as they restrict the use of the plaintiff's property." At the trial there was no dispute concerning the five-acre requirement, but only as to the propriety of putting the plaintiff's five-eighths of an acre piece of property in the "B" or five-acre zone. Furthermore, the plaintiff's witnesses joined the defendant's in testifying as to the reasonableness of having a five-acre zone in a community such as Bedminster. Indeed, Mr. Scott Bagby, the plaintiff's zoning consultant, testified that he would have reduced the $3\frac{1}{2}$ square miles of the "A" or one-half acre zone to 940 acres, or less than half of what was set aside for that zone in the ordinance, and he would "raise the five acre zone to a ten acre zone because of the extremely open character of this area." But the question of the constitutionality of the five-acre requirement was dealt with by the trial court in deciding the narrower issue before it; it has

been fully briefed and argued here by both sides; and, involving as it does both constitutional issues and important questions of public policy, we deem it our duty in the public interest to decide the matter. *Morin v. Becker,* 6 *N. J.* 457, 460 (1951), and the cases there cited. The issue is one of very real concern to the many rural municipalities, and the citizens thereof, that exist beyond the pale of urban and suburban development and that have preserved their character unchanged for more than a century.

In dealing with the zoning power we need constantly to keep in mind that it rests not merely on the police power of the State, but on the police power as set forth in express constitutional authorization to the Legislature to enact statutes giving municipalities the power to enact zoning ordi-. nances. In its original form the constitutional authorization extended only to "buildings and structures, according to their construction, and the nature and extent of their use," *Article IV, Section VI, paragraph 5* of the *Constitution of 1844* as amended in 1927, but the Constitution of 1947 went further and expressly extended the zoning power also to *"the nature and extent of the uses of land," Article IV, Section VI, paragraph 2.* Both the 1927 amendment and the provision in the 1947 Constitution relating to zoning declared that "the exercise of such authority shall be deemed to be within the police power of the State." This declaration was aimed at overruling the restricted judicial view of the scope of the police power with respect to zoning that had prevailed here prior to 1927. See *Schmidt v. Board of Adjustment of Newark,* 9 *N. J.* 405, 416 (1952), commenting on *Ignaciunas v. Risley,* 93 *N. J. L.* 712 (*Sup. Ct.* 1923), affirmed *sub. nom. State v. Town of Nutley,* 99 *N. J. L.* 389 (*E. & A.* 1924), and *H. Krumgold & Sons v. Mayor, &c., Jersey City,* 102 *N. J. L.* 170 (*E. & A.* 1925). The effect, moreover, of the foregoing provision is strengthened by *Article IV, Section VII, paragraph 11* of the new Constitution, which has no counterpart in the Constitution of 1844. It admonishes all that .

"The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties shall be liberally construed in their favor. * * *"

The Legislature lost no time in conforming the zoning statutes to the enlarged zoning power granted it by the new Constitution. *L.* 1948, *c.* 305, amended *R. S.* 40:55–30 and *R. S.* 40:55–31, the existing zoning enabling acts, so as to provide for the broadest possible grant of power to the municipalities:

"Any municipality may by ordinance, limit and restrict to specified districts and may regulate therein, buildings and structures according to their construction, and the nature and extent of their use, and *the nature and extent of the uses of land,* and the exercise of such authority, subject to the provisions of this article, shall be deemed to be within the police power of the State. * * *"

"The authority conferred by this article shall include the right to regulate and restrict the height, number of stories, and sizes of buildings, and other structures, the percentage of lot that may be occupied, the sizes of yards, courts, and other open spaces, the density of population, and the location and use and extent of use of buildings and structures and land for trade, industry, residence or other purposes." *N. J. S. A.* 40:55–30.

"For any or all of said purposes the governing body or board of public works may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of this article, and it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings or other structures, and *the nature and extent of the uses of land,* within such districts. * * *" *N. J. S. A.* 40:55–31.

Particularly important to our reasoning is the next section of this statute dealing with the purposes of zoning:

"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets, secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. *Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality.*" *R. S.* 40:55–32.

It was on the basis of these constitutional and statutory provisions that we have upheld a zoning ordinance in a residential community which made no provision for heavy industry where there was elsewhere in the same geographical region ample facilities for future industrial development, *Duffcon Concrete Products v. Cresskill,* 1 *N. J.* 509 (1949), where we said at *p.* 513:

"What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously."

In *Lionshead Lake, Inc. v. Township of Wayne,* 10 *N. J.* 165 (1952), we sustained a zoning ordinance imposing reasonable living-floor space requirements for dwellings, applying the principle enumerated in *Schmidt v. Board of Adjustment of Newark, supra,* 9 *N. J.* 405 (1952), that so long as the zoning ordinance was reasonably designed, by whatever means, to further the advancement of a community as a social, economic and political unit, it is in the general welfare and therefore a proper exercise of the zoning power. The underlying philosophy of zoning had never been better expressed than in *Euclid v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303, at 310 (1926), one of the leading cases on the constitutional aspects of zoning.

"Building zone laws are of modern origin. They began in this county about 25 years ago. Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street rail-

ways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. * * *"

What was said there a quarter of a century ago of rapidly developing urban problems is equally true now, due to the automobile and fine highways, of suburban and rural problems. As much foresight is now required to preserve the countryside for its best use as has been needed to save what could be salvaged of our cities.

In the last analysis the issue in the present case comes down to whether or not the five-acre provision of the zoning ordinance is unreasonable *per se*, for virtually the only evidence presented to show its unreasonable nature was the testimony of the plaintiff's expert, Mr. Bagby, who took the view that the township could have avoided any future health problems by a minimum plot size of 15,000 to 20,000 square feet. But, as we have already noted, Mr. Bagby also testified that, because of the "extremely open character of the area," in his rezoning plan he considered ten acres a proper minimum in the "B" zone, and he would have reduced the permissible number of half-acre lots to less than half of those provided in the ordinance. The chief difference between the experts, Mr. Bagby for the plaintiff and Mr. Hugh R. Pomeroy for the township, was over a matter not really in issue— the location of the half-acre plots. Mr. Bagby favored clustering these lots around the "villages." Mr. Pomeroy agreed with the cluster theory, but claimed that the half-acre lots actually were clustered in fact and in a way best suited to the needs of the township. The burden of proving the ordinance unreasonable is on the party attacking the ordinance and clearly the plaintiff has not met it.

The plaintiff places great stress on the fact that no case can be found sustaining a five-acre requirement. In *Simon v. Town of Needham*, 311 *Mass.* 560, 42 *N. E. 2d*

516, 141 *A. L. R.* 688 (*Sup. Jud. Ct.* 1942, a one-acre requirement was approved in a town near Boston. In *Dilliard v. Village of North Hills,* 94 *N. Y. Supp.* 2d 715 (*App. Div.* 1950), an ordinance of a suburban Long Island town requiring a two-acre plot was likewise sustained. In *Flora Realty and Investment Co. v. City of Ladue,* 362 *Mo.* 1025, 246 *S. W.* 2d 771 (1952), appeal to the United States Supreme Court dismissed for want of a substantial federal question, 73 *S. Ct.* 41, (Oct. 13, 1952), a three-acre requirement in a suburb of St. Louis was upheld. Decisions upholding one-, two- and three-acre provisions in suburban communities are not authority against a five-acre provision in a strictly rural area. No case has been presented where a five-acre provision has been struck down as unreasonable and arbitrary. On the contrary, the experts for the defendant township agree that it is not unreasonable and the plaintiff's expert, Mr. Bagby, would go to ten acres. Such a ten-acre provision in an ordinance has been in effect in the adjoining borough of Far Hills for several years, and nearby Bernardsville has a five-acre zone. Both of these ordinances have stood unchallenged. With all these facts before us we clearly would not be justified in holding a five-acre requirement unreasonable *per se.* On the contrary, there would appear to be ample justification for the ordinance in preserving the character of the community, maintaining the value of property therein and devoting the land throughout the township for its most appropriate use. It must, of course, be borne in mind that an ordinance which is reasonable today may at some future time by reason of changed conditions prove to be unreasonable. If so, it may then be set aside, *Lionshead Lake, Inc. v. Township of Wayne, supra,* 10 *N. J.* 165, 172–173.

The plaintiff also contends that even if the contested five-acre provision of Article VII is held to be constitutional generally, its requirements as to the plaintiff's property are arbitrary and unreasonable and therefore to that extent null and void. This argument is quite without

merit, for the validity of a zoning ordinance is not to be determined by reference to a single individual property. If the plaintiff is dissatisfied with the application of the zoning laws to his particular property, he may apply to the board of adjustment for a variance. More specifically, the plaintiff argues that the boundary line between the "A" one-half acre and the "B" five-acre residence zones was improperly placed and particularly that his property should have been located in an "A" zone with a one-half acre minimum rather than in the "B" zone with a five-acre minimum. On this point, however, the plaintiff has wholly failed to introduce proof to overcome the presumption of validity of the ordinance. It is not sufficient for the plaintiff to show that it would be more profitable for him to use his property in a manner prohibited by the ordinance; he must show an abuse of discretion resulting in an unreasonable exercise of the zoning power. He cannot do this merely by showing that the physical characteristics of his property are no different from those of properties located in a different zone. At best the plaintiff showed a mere borderline case, but such a showing is not sufficient. See *Coriell v. Dunellen,* 122 *N. J. L.* 172 (*Sup. Ct.* 1939), affirmed on the opinion below, 123 *N. J. L.* 264 (*E. & A.* 1939), where the court said at *p.* 173:

"If a municipality is to be zoned for or against various uses, it is inevitable that zones with differing restrictions should abut, and it is likely that a degree of apparent hardship will thus be visited upon the more restricted area along the line of junction. It is not shown to us how this court may for that, and only that, reason command the allowance of an exception by a Board of Adjustment without ultimately sounding the death knell of the whole zoning movement."

The judgment appealed from is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice WACHENFELD—1.