ALPHONSE PIERRO AND FRANK PIERRO, PLAINTIFFS-RESPONDENTS, v. WILLIAM H. BAXENDALE, BUILDING INSPECTOR OF THE BOROUGH OF PALISADES PARK, AND MAYOR AND COUNCIL OF THE BOROUGH OF PALISADES PARK, DEFENDANTS-APPELLANTS.

Argued October 3, 1955—Decided November 21, 1955.

*Mr. Max Eisenstein* argued the cause for the appellants (*Messrs. Eisenstein & Eisenstein,* attorneys).

*Mr. James A. Major* argued the cause for the respondents.

The opinion of the court was delivered by

JACOBS, J.   In 1939 Palisades Park adopted a zoning ordinance which divided the borough into residential, business and industrial districts.   District AA was generally

restricted to one- and two-family dwellings and District A to one- and two-family dwellings and apartment houses. Hotels and motels were not expressly permitted in Districts AA and A although "boarding and rooming houses" (and other limited uses not pertinent here) were expressly permitted. The ordinance defined a boarding house as "any dwelling in which more than six persons not related to the owner or occupant by blood or marriage are lodged and boarded for compensation"; it defined a rooming house as "any dwelling where furnished rooms are rented to more than six persons for compensation, provided however, the lodging of relatives, by blood or marriage, of the owner or occupant of such dwelling shall not come within these terms."

The plaintiffs are the owners of land located within residential District A. · On May 19, 1954 they applied to the building inspector of the borough for a permit to erect a 27-unit motel on their land but the application was denied; no administrative appeal from the denial was taken by the plaintiffs nor did they ever seek a variance under *N. J. S. A.* 40:55–39. On May 25, 1954 the borough adopted a supplemental zoning ordinance which expressly prohibited the construction within Palisades Park of "motels, motor courts, motor lodges, motor hotels, tourist camps, tourist courts, and structures of a similar character intended for a similar use." On May 28, 1954 the plaintiffs filed a complaint in the Law Division seeking a judgment directing the issuance of a permit to them in accordance with their application to the building inspector and setting aside the supplemental ordinance. The defendants filed their answer to the complaint and on December 9, 1954 a pretrial order was duly entered.

On February 10, 1955 the matter came on for trial before the Law Division but no oral testimony was taken; instead, the parties in open court entered into a short stipulation on which the judgment ultimately entered must rest. The stipulation set forth that the Borough of Palisades Park is approximately a mile square and is located about a mile and a half south(west) of the George Washington Bridge; it is a residential community composed principally of one-family

homes and "is zoned percentagewise as follows: 80 percent for residential purposes, 9 percent for business purposes, 3 percent for light industry, and 8 percent for heavy industry, which area lies solely west of the Northern Railroad tracks"; there are no motels in Palisades Park but there are motels in the Borough of Fort Lee (which lies immediately to the north(east) thereof) and in other nearby communities; the plaintiffs' property is located on Temple Terrace in a residential area "and on the same block, or immediately adjacent to the property, there is a two-family house with considerable shrub area immediately adjacent to it," and "on the opposite side of Temple Terrace there is a large ranch type house presently being built"; "both sides of (nearby) Sunset Place have been built up with one-family residences, many of them within the last 4 or 5 years"; and "another large ranch type home is being built on East Edsal Boulevard near the property in question." In answer to an interrogatory submitted by the plaintiffs, the Borough of Palisades Park stated that it had issued 19 tavern licenses and 12 licenses for the sale of alcoholic beverages for off-premises consumption; apparently all of these establishments are in the business district.

After considering the arguments and briefs of counsel the trial judge expressed the view that "a motel is a rooming house" and that there is no "fair and reasonable discrimination between a motel as a rooming house and some other type of rooming house"; he therefore concluded that the supplementary ordinance was invalid and that the plaintiffs were entitled to a building permit for the erection of a motel on their property in residential District A, provided its manner of construction was in conformity with the borough's building requirements; he entered final judgment to that effect and the defendants duly served and filed their notice of appeal therefrom to the Appellate Division. We certified under *R. R.* 1:10–1(*a*).

The plaintiffs do not attack the validity of the 1939 ordinance which placed their property in a residential zone. And in the absence of an affirmative showing of unreason-

ableness they admittedly could not attack the right of the borough to exclude all private business operations, including boarding and rooming houses, hotels, motels and tourist camps, from the residential zones within the borough. *Cf. Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200, 208 (1949); *Euclid, Ohio v. Ambler Realty Co.,* 272 *U. S.* 365, 388, 47 *S. Ct.* 114, 71 *L. Ed.* 303, 311 (1926). They do, however, deny the borough's right to permit boarding and rooming houses in residential zones and at the same time exclude motels therefrom; as we view the terms of the 1939 ordinance the borough contemplated the exclusion of hotels, motels and similar businesses from the residential zones without, nevertheless, curbing the right of dwelling house owners or occupants to use their premises for boarding and rooming house purposes. If this classification by the borough has no reasonable basis then it must fall as the plaintiffs contend; if, on the other hand, it has reasonable basis then it may be permitted to stand and serve to exclude the operation of a motel in a residential zone as proposed by the plaintiffs. See *Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341, 353 (1953); *Zullo v. Board of Health of Woodbridge Tp.,* 9 *N. J.* 431, 439 (1952); *Schmidt v. Board of Adjustment of City of Newark,* 9 *N. J.* 405, 418 (1952). *Cf. Euclid, Ohio v. Ambler Realty Co., supra; United States v. Burnison,* 339 *U. S.* 87, 95, 70 *S. Ct.* 503, 94 *L. Ed.* 675, 682 (1950); *Inhabitants of York Harbor Village Corp. v. Libby,* 126 *Me.* 537, 140 *A.* 382 (1928). As Chief Justice Vanderbilt aptly remarked for the entire court in the *Zullo* case, legislative bodies may make such classifications as they deem necessary and as long as their classifications are based upon reasonable grounds "so as not to be arbitrary or capricious" they will not be upset by the courts.

In *Yanow v. Seven Oaks Park, Inc., supra,* we recently upheld a zoning ordinance which permitted public and parochial elementary and high schools, but prohibited colleges and other schools of higher learning, in residential areas. In the course of his opinion, Justice Burling set forth grounds for differentiating schools for the education of community

children from institutions of higher learning and quoted approvingly from the *Euclid* case where Justice Sutherland pointedly remarked that "if the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." See *Portage Township v. Full Salvation Union*, 318 *Mich.* 693, 29 *N. W. 2d* 297 (1947); *State ex rel. Wisconsin Lutheran High School Conference v. Sinar*, 267 *Wis.* 91, 65 *N. W. 2d* 43 (1954). In 420 *Broad Ave. Corp. v. Borough of Palisades Park*, 137 *N. J. L.* 527 (*Sup. Ct.* 1948), the Borough of Palisades Park had amended its zoning ordinance so as to prohibit the use of premises in business districts for the sale of used cars. The former Supreme Court, after pointing out that the amendment was being attacked without any affirmative proof to overcome the settled presumption as to its validity, declined to upset it, recognizing that the business of selling used cars may properly be "distinguished from the selling of new cars," and holding that the classification by the borough was not "unreasonable, arbitrary or capricious." In *Ring v. Mayor and Council of Borough of North Arlington*, 136 *N. J. L.* 494, 499 (*Sup. Ct.* 1948), Justice Heher similarly remarked that the classification between new and used car businesses was not "vicious on its face." *Cf. Piaget-Del Corp. v. Kulik*, 133 *N. J. L.* 485, 486 (*Sup. Ct.* 1945).

In *State ex rel. Howard v. Village of Roseville*, 70 *N. W. 2d* 404, 406 (*Minn. Sup. Ct.* 1955), the court sustained an ordinance which prohibited trailer park usage in a residential zone "except to the extent maintained at the time of the adoption of the ordinance"; in his opinion for the Minnesota Supreme Court, Justice Gallagher said:

"Insofar as zoning ordinances are concerned, it has frequently been held that what best furthers public welfare is a matter primarily for determination of the legislative body concerned, *Kiges v. City of St. Paul*, 240 *Minn.* 522, 62 *N. W. 2d* 363; *State ex rel. Beery v. Houghton, supra* [164 *Minn.* 146, 204 *N. W.* 569, 54 *A. L. R.* 1012], *Dundee Realty Co. v. City of Omaha*, 144 *Neb.* 448, 13 *N. W. 2d* 634, and under this principle ordinances which designate residential districts and exclude trailer parks and like enterprises

therefrom have often been upheld as valid exercises of the police power. *E. g. Fishman v. Tupps*, 127 *Colo.* 463, 257 *P. 2d* 579; *Huff v. City of Des Moines*, 244 *Iowa* 89, 56 *N. W. 2d* 54; *Midgarden v. City of Grand Forks*, *N. D.*, 54 *N. W. 2d* 659; see Annotation, 22 *A. L. R. 2d* 793.

Even where the reasonableness of a zoning ordinance is debatable, or where there are conflicting opinions as to the desirability of the restrictions it imposes or the suitability for residential purposes of property so designated thereby, it is not the function of the courts to interfere with the legislative discretion on such issues."

In *Von Der Heide v. Zoning Board of Appeals*, 204 *Misc.* 746, 123 *N. Y. S. 2d* 726 (*Sup. Ct.* 1953), affirmed 282 *App. Div.* 1076, 126 *N. Y. S. 2d* 852 (1953) *leave to appeal denied* 306 *N. Y.* 985, 119 *N. E. 2d* 610 (*Ct. App.* 1954), the plaintiff applied for a building permit to erect a motel in a business district in the Town of Somers, Westchester County. His application was denied and he sought to upset the denial on the ground that he came within a provision of the ordinance which permitted the operation of a "boarding house or inn" as a proper business use. Justice Eager found that the proposed motel was not embraced within the term boarding house, particularly since the ordinance provided that no boarding house shall be operated unless "the operator thereof shall be the owner of the premises and reside therein"; he also found that the proposed motel was not an inn, saying:

"The court has come to the conclusion that the petitioner's motel is not an 'inn' within the ordinary meaning of such word. True, the word 'motel' is a coined and modern word derived from, and an abbreviation of the words 'motorists' hotel', *i. e.*, 'motel' (*Webster's New Collegiate Dictionary*, 1949; *Funk & Wagnall's New Standard Dictionary*, 1951), and the word 'inn' in present day use is synonymous with the word 'hotel'. See, *Dixon v. Robbins*, 246 *N. Y.* 169, 172, 158 *N. E.* 63, 53 *A. L. R.* 986. But a motel is commonly understood to be an establishment essentially different from an inn or hotel in design, purpose and use. From early times, an inn or hotel was 'a house of entertainment for travelers', or 'a house where a traveler is furnished, as a regular matter of business, with food and lodging while on his journey.' *Waitt Const. Co. v. Chase*, 197 *App. Div.* 327, 188 *N. Y. S.* 589, 592. An inn or hotel more elaborately defined, may be considered as an establishment where guests, transient or otherwise, are lodged for a consideration and where they may receive for a consideration, meals, maid or room-service, telephone or desk service and all other neces-

sities, conveniences and facilities to completely take care of all their ordinary and proper wants, day and night, for a stay of one day, several days or a long period. On the other hand, a motel, as one generally understands the term, and as typified by the building sought to be erected by this petitioner, merely furnishes the transient guest with sleeping quarters and bath and toilet facilities, with linen service and a place to park his car." (123 *N. Y. S.* 2d 726, at *page* 729)

In *City of Independence v. Richardson,* 117 *Kan.* 656, 232 *P.* 1044, 1046 (1925), the court defined hotels as business institutions which are held out to the public as places where all travelers or other transient persons "having means of payment, and of proper demeanor and fair repute, who choose to patronize" them must be received and accommodated. In contrast, the court defined boarding houses simply as places which furnish selected patrons with food and lodging, and rooming houses as places "where there are one or more bedrooms which the proprietor can spare for the purpose of giving lodgings to such persons as he chooses to receive."/ See also 28 *Am. Jur.* 543 (1940) where the editors have the following to say under the caption "Inns and Hotels Distinguished from Boarding, Lodging and Rooming Houses":

"While there is a certain similarity between inns and hotels on the one hand, and boarding, lodging, and rooming houses on the other, the two classes of houses differ from each other by definition in certain fundamental characteristics. The principal distinction is that in the case of houses of the latter class, the proprietor deals with his customers individually with respect to terms and accommodations and exercises the right to reject any or all applicants at his pleasure, while in the case of inns and hotels the proprietor deals with the public generally on the basis of an implied contract and may not arbitrarily refuse to receive as a guest one who is entitled to be so received, as has been pointed out in prior sections. A boardinghouse has also been said to differ from an inn or hotel both in being less public in character and in arranging with its patrons to provide for them during some more or less definite period."

*Cf.* 4 *Williston, Contracts* (rev. ed. 1936), § 1066.

Motels have some but by no means all of the aspects of hotels. See *Von Der Heide v. Zoning Board of Appeals,*

*supra; Allinder v. City of Homewood,* 254 *Ala.* 525, 49 *So.* 2*d* 108, 22 *A. L. R.* 2*d* 763 (1950). *Cf. Schermer v. Fremar Corp.,* 36 *N. J. Super.* 46 (*Ch. Div.* 1955). It is true that motels and hotels both furnish overnight lodging to transient guests but they differ generally in their structural design and location, in the services they render and the uses to which they are put, and in the extent of control or supervision readily available to their operators. However, passing the differences between motels and hotels, it seems clear to us that motels may without difficulty be differentiated from boarding and rooming houses. Motels are business institutions which cater to members of the general public and by and large are obliged to serve them indiscriminately. As such business institutions they possess, in substantial degree, the attributes which have led to the exclusion of businesses generally from residential zones. On the other hand, boarding and rooming houses may select guests with care and are admittedly "less public in character." *State v. Brown,* 112 *Kan.* 814, 212 *P.* 663, 31 *A. L. R.* 338 (1923). They are located in buildings which have the outward appearances of private dwelling houses and their commercial features and incidents are insignificant when compared to those of motels.

In *Menger v. Pass,* 367 *Pa.* 432, 80 *A.* 2*d* 702, 24 *A. L. R.* 2*d* 562 (1951), the Pennsylvania Supreme Court, by a divided vote, refused to exclude a motel or tourist court from a residential area which was "unzoned and unrestricted"; the court expressed the view that if the residents wish to preserve their neighborhood "in an unchanged condition," "they must secure appropriate zoning ordinances or be protected by building restrictions." The trial judge, in reaching his conclusion that the motel or tourist court should be excluded from the residential area even in the absence of zoning restrictions advanced the following reasons of interest here:

"The purpose of the tourist court is to rent rooms by the night to transients. There will be a parking place for approximately 25 cars. Nearly that number are likely to be there almost every night of the year. Some guests will come in the late afternoon, leave

again for dinner and come back. Some will arrive in the early evening, but some undoubtedly will arrive later. The lights to attract them will be on until 11:30. If there are vacancies in the court, motorists will be received later. Some of those who stop are bound to leave early in the morning, some later. Car doors will bang, not only to permit passengers to leave and enter the vehicle, but also to remove the luggage, and often again for the forgotten package. Trunks too will bang. And a certain amount of loud talk during the unloading—the 'don't forget' variety of calls from the cabin door to the parked car—is inevitable."

The officials of Palisades Park viewed boarding and rooming houses as being consistent with residential areas and motels as being inconsistent therewith; it seems clear to us that their views may not be said to be wholly without reasonable basis and that the lower court's conclusion to the contrary was erroneous. It must always be remembered that the duty of selecting particular uses which are congruous in residential zones was vested by the Legislature in the municipal officials rather than in the courts. Once the selections were made and duly embodied in the comprehensive zoning ordinance of 1939 they became presumptively valid and they are not to be nullified except upon an affirmative showing that the action taken by the municipal officials was unreasonable, arbitrary or capricious. See *Monmouth Lumber Co. v. Ocean Township*, 9 *N. J.* 64, 71 (1952); *Dover Township v. Witt*, 7 *N. J. Super.* 259, 262 (*App. Div.* 1950). No such showing was made in the instant matter and, consequently, the plaintiffs were not legally entitled to the building permit which they requested for the construction of a motel in a residential zone.

The judgment entered in the lower court not only directed the issuance of the building permit but also set aside the supplemental ordinance enacted on May 25, 1954. In support of this action the plaintiffs have advanced the far-reaching contention that no municipality in the State has power to exclude motels from all zoning districts within its territorial limits and that the supplemental ordinance must, therefore, be deemed void on its face. They cite cases such as *Weininger v. Borough of Metuchen*, 133 *N. J. L.* 544

(*Sup. Ct.* 1946), affirmed 134 *N. J. L.* 562 (*E. & A.* 1946), and *First Church of Christ, Scientist v. Board of Adjustment, Newark,* 127 *N. J. L.* 325 (*Sup. Ct.* 1941), affirmed 128 *N. J. L.* 376 (*E. & A.* 1942), where the courts disapproved municipal zoning ordinances which sought to exclude particular types of residences such as three-family houses and particular types of businesses such as gasoline stations. However, those cases were decided before the adoption of our Constitution of 1947 and the many broad statutory provisions and judicial determinations thereunder which must now serve as our guides. See *Ward v. Scott,* 16 *N. J.* 16, 22 (1954); *Garrou v. Teaneck Tryon Co.,* 11 *N. J.* 294, 298 (1953). *Cf. Note, Zoning Under the Constitution of* 1947, 9 *Rutgers L. Rev.* 697 (1955).

In *Duffcon Concrete Products v. Borough of Cresskill,* 1 *N. J.* 509 (1949), this court sustained a zoning ordinance which excluded heavy industry from all districts in the borough (see 9 *A. L. R.* 2d 683 (1950)); in *Lionshead Lake, Inc., v. Township of Wayne,* 10 *N. J.* 165 (1952), appeal dismissed 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953), an ordinance which prohibited the construction of very small houses (containing less than 768 square feet for a one-story dwelling) anywhere in the township was sustained by this court; and in *Guaclides v. Borough of Englewood Cliffs,* 11 *N. J. Super.* 405 (1951) the Appellate Division sustained a zoning restriction which excluded apartment houses from substantially the entire borough. In *Fischer v. Township of Bedminster,* 11 *N. J.* 194 (1952), we sustained a five-acre zoning requirement and rested our holding on the primary ground that there was "ample justification for the ordinance in preserving the character of the community, maintaining the value of property therein and devoting the land throughout the township for its most appropriate use." See 11 *N. J.* at *page* 205. *Cf. Schmidt v. Board of Adjustment, Newark,* 9 *N. J.* 405, 422 (1952); *Lionshead Lake, Inc. v. Township of Wayne, supra,* 10 *N. J.* at *page* 172; *Cobble Close Farm v. Bd. of Adjustment, Middletown Tp.,* 10 *N. J.* 442, 451 (1952).

In *State ex rel. Saveland Park Holding Corp. v. Wieland,* 269 *Wis.* 262, 69 *N. W. 2d* 217 (1955), *certiorari* denied 350 *U. S.* 841, 76 *S. Ct.* 81, the court recently gave its full approval to the doctrine of the *Bedminster* case, *supra,* that reasonable restrictions designed to preserve the character of a community and maintain its property values are within the proper objectives of zoning. There the Wisconsin Supreme Court sustained a village zoning requirement that the exterior architectural appeal and functional plan of proposed structures be not so at variance with other structures as to cause substantial depreciation in property values. Justice Currie pointed out that zoning in his state, as in ours (*R. S.* 40:55-32), is designed to promote not only health and morals but also the "general welfare"; and he quoted approvingly from the recent opinion of Justice Douglas in *Berman v. Parker,* 348 *U. S.* 26, 75 *S. Ct.* 98, 99 *L. Ed.* 27 (1954), where the Supreme Court said:

"The concept of the public welfare is broad and inclusive. See *Day-Brite Lighting, Inc., v. Missouri,* 342 *U. S.* 421, 424, 72 *S. Ct.* 405, 96 *L. Ed.* 469, 472. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

In our own State the general welfare concept has received similarly broad definition. In *Schmidt v. Board of Adjustment of Newark, supra,* Justice Heher remarked that although earlier cases had confined zoning to such regulations as were needful for the public health, safety and morals, later cases had recognized regulations requisite for "public convenience" and "general prosperity" as promoting the general welfare. See 9 *N. J.* at *page* 415. In the *Lionshead* case, *supra,* Chief Justice Vanderbilt referred to the *Schmidt* case as a holding to the effect that so long as the zoning ordinance is reasonably designed "to further the ad-

vancement of a community as a social, economic and political unit, it is in the general welfare and therefore a proper exercise of the zoning power." See 10 *N. J.* at *page 172.* Cf. also the opinion of Justice (then Judge) Brennan in *Guaclides v. Borough of Englewood Cliffs, supra,* 11 *N. J. Super.* at *page 413.*

We are aware of the extensive academic discussion following the decisions in the *Lionshead* and *Bedminster* cases, *supra,* and the suggestion that the very broad principles which they embody may intensify dangers of economic segregation which even the more traditional modes of zoning entail. Compare *Haar, Zoning for Minimum Standards: The Wayne Township Case,* 66 *Harv. L. Rev.* 1051 (1953) with *Nolan and Horack, How Small a House?—Zoning for Minimum Space Requirements,* 67 *Harv. L. Rev.* 967 (1954). See *Land Planning in a Democracy,* 20 *Law and Contemporary Problems* 197 *et seq.* (1955). But as was indicated in *Ward v. Scott, supra,* we remain convinced that the principles we have enunciated are in furtherance of the constitutional and statutory objectives and the public welfare generally. One can hardly say that the narrow zoning concepts, which pervaded much of the thinking in our State before the 1947 Constitution, served effectively to advance the public welfare; indeed we need but look about us at our many blighted urban and even suburban areas to observe the combined effects of lack of municipal vision and restrictive judicial pronouncements. We are satisfied that at long last conscientious municipal officials have been sufficiently empowered to adopt reasonable zoning measures designed towards preserving the wholesome and attractive characteristics of their communities and the values of taxpayers' properties. In the light of existing population and land conditions within our State these powers may fairly be exercised without in anywise endangering the needs or reasonable expectations of any segments of our people. If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed. See *Lionshead Lake, Inc., v. Township of Wayne, supra,* 10 *N. J.* at

30

*pages* 172–173; *Fischer v. Township of Bedminster, supra,* 11 *N. J.* at *page* 205.

■ The environmental characteristics of many of our beautiful residential communities are such that the establishment and operation of motels therein would be highly incongruous and would seriously impair existing property values. We know of no sound reason why such communities may not, as part of their comprehensive zoning, reasonably exclude such enterprises. On the other hand, there are many communities which are so constituted and located that they could not properly advance any sound objections to motels within their borders; although such communities may not entirely exclude them, they may reasonably confine them to compatible districts. In the instant matter the parties have not given us any oral testimony with respect to the characteristics of Palisades Park and its surrounding territory, nor have they suggested that we take judicial notice thereof. They have told us in their short stipulation that the borough is mostly residential with part of its territory zoned for business and industrial purposes, but we know little or nothing about the nature of its residences or the nature of its businesses and industries or the need for additional motel facilities in the general area. The burden of the attack by the plaintiffs has not been directed against the supplemental ordinance in its particular application to the evidence before the lower court; instead their contention has consistently been that the supplemental ordinance is void on its face and should therefore be stricken without more, and that they are entitled to construct and operate their proposed motel within an area which has long been zoned for residential purposes. This contention has been rejected by us in both of its aspects. And, in any event, we do not feel free to say on the inadequate record before us and at the behest of objectors whose property is in a residential zone, that the borough's general restriction against motels is wholly invalid in the light of its own and surrounding characteristics. *Cf. Borough of Cresskill v. Borough of Dumont,* 15 *N. J.* 238, 247 (1954).

Reversed.

HEHER, J. (dissenting). The zoning ordinance of 1939 divided the Borough of Palisades Park into five use districts: "District AA—Residence—One and Two Family Dwellings; District A—Residence; District B—Business; District C—Light Industry; District D—Heavy Industry." In District A, multiple family dwellings, group houses, garden-type apartments, and apartment houses are also permissible; and in District AA and District A, certain additional uses are allowed, such as churches, schools or educational institutions "other than privately conducted business or vocational schools," membership clubs, social and recreational buildings "except those in which the chief activity is a service carried on as a business," public and private parks, playgrounds and gardens, "accessory buildings," the professional offices and studios of residents, hospitals, and "boarding and rooming houses," the former defined as "any dwelling in which more than six persons not related to the owner or occupant by blood or marriage are lodged and boarded for compensation," and the latter as "any dwelling where furnished rooms are rented to more than six persons for compensation," excluding the "lodging" of relatives of the owner or occupant by blood or marriage. "Trade" and "business" and uses authorized in District AA and District A are permissible in District B. In District C, "light industry," the uses sanctioned in AA, A and B are also allowed; and all such are likewise permitted in District D, "heavy industry." Certain uses are specifically banned in B, C and D, "trailer camp or trailer park" among them, but not motels.

The site of the proposed 27-unit motel is in District A.

By the supplement to the zoning ordinance adopted May 25, 1954, "motels, motor courts, motor lodges, motor hotels, tourist camps, tourist courts, and structures of a similar character intended for a similar use, by whatever name the same may be called, whether one or more stories in height," are forbidden within the borough.

The preamble to this local legislative act recites that the mayor and council deemed such uses "contrary to the best interests of the people of the Borough." Conceding that

motels "as such are admittedly not immoral *per se,*" it is said in argument that it is the "expressed conviction" of the mayor and council that "such structures offer great temptation to the conduct of immoral actions" and the design of the supplement was to "remove such temptation," and to avoid the "potential evils" attending on occasion the operation of such facilities, unfavorable publicity and police action, and "For such valid and legitimate purposes as motels may serve the traveling public, accommodations may be had in the neighboring municipalities of Fort Lee, or in other communities nearby," thus acknowledging a legitimate public need that must be denied because lax operation of such facilities gives rise to police problems of supervision, a "burden" to be borne by the neighboring communities.

But this community-wide interdiction evinces, I would suggest, a basic misconception of the philosophy of zoning and the constitutional and statutory zoning process. The supplement is *ultra vires* the local municipal corporation.

The statutory power, *R. S.* 40:55–30, as amended by *L.* 1948, *c.* 305, is to "limit and restrict to specified districts" and to "regulate therein" buildings and structures "according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land," derived from and necessarily limited by the constitutional grant to the Legislature in the selfsame terms, *Article* IV, *section* VI, *paragraph* 2, "deemed to be within the police power of the State." All such regulations, *R. S.* 40:55–31, as amended by *L.* 1948, *c.* 305, "shall be uniform for each class or kind of buildings or other structures or uses of land throughout each district, but the regulations in one district may differ from those in other districts." Such regulations shall be, *R. S.* 40:55–32, "in accordance with a comprehensive plan," designed to serve the enumerated public considerations, and shall be made "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout the municipality."

The essence of zoning, we have so often said, is territorial division according to the character of the lands and structures and their peculiar suitability for particular uses, and uniformity of use within the division. Due process demands that the exercise of the power shall not be unreasonable, arbitrary or capricious, and the means selected for the fulfillment of the policy shall bear a real and substantial relation to that end. There must be a rational relation between the regulation and the service of the common welfare in an area within the reach of the police power. Restraints upon property cannot be exorbitant or unduly discriminatory. A police regulation that goes beyond the public need is not effective to curtail the rights of person or of private property made the subject of constitutional guaranties. Arbitrary or unreasonable restraints may not be put upon the exercise of the basic right of private property. *Schmidt v. Board of Adjustment of Newark*, 9 *N. J.* 405 (1952). Excesses in serving the public end in view are inadmissible. *Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949). Thus, the genius of the constitutional and statutory zoning process is the regulation of land and buildings by districts according to the nature and extent of their use; and the particular regulation is not in that category. See *Bassett, Zoning*, 26, 45. The fields of regulation authorized in state enabling acts are usually height, area, and use of buildings, use of land, and density of population. *Ibid.* 49 *et seq.* It is fundamental that zoning is not based on the doctrine of common-law nuisance. Zoning regulations and common-law nuisances involve different legal principles. *Eaton v. Klimm*, 217 *Cal.* 362, 18 *P. 2d* 678 (*Sup. Ct.* 1933); *Nailor v. C. W. Blakeslee & Sons, Inc.*, 117 *Conn.* 241, 167 *A.* 548 (*Sup. Ct. Err.* 1933); *Beane v. H. K. Porter, Inc.*, 280 *Mass.* 538, 182 *N. E.* 823 (*Sup. Jud. Ct.* 1932); *Bassett, Zoning*, 93.

And it is generally recognized that in the nature of the business and the accommodations furnished, there is no substantial difference between motels or bungalow courts and hotels or multiple dwellings. Zoning ordinances per-

mitting the operation of hotels or multiple dwellings in certain areas have been held to apply with equal force to the maintenance of motels or bungalow courts. 22 *A. L. R. 2d* 798.

In *Long v. Norton Township*, 327 *Mich.* 627, 42 *N. W. 2d* 764 (*Sup. Ct.* 1950), it was held that a motel designed to accommodate transients was a "multiple dwelling" within the meaning of a zoning ordinance permitting such a dwelling to be erected and maintained within a certain area. And in *People ex rel. Grommon v. Hedgcock*, 106 *Colo.* 300, 104 *P. 2d* 607 (*Sup. Ct.* 1940), involving an application to compel the issuance of a permit for the construction of a bungalow court in a "business" district, where a hotel or other multiple dwelling was permitted, it was said that there was little, if any, difference in the use of a hotel or multiple dwelling and a bungalow court, and the "police power, which is the legal basis for zoning legislation, must constantly be reconciled with the legitimate use of private property, in harmony" with constitutional guaranties.

Here, my brethren say: "(A)s we view the terms of the 1939 ordinance the Borough contemplated the exclusion of hotels, motels and similar businesses from the residential zones without, nevertheless, curbing the right of dwelling house owners or occupants to use their premises for boarding and rooming house purposes"; and "If this classification by the Borough has no reasonable basis then it must fall as the plaintiffs contend; * * *."

But in District A, as shown *supra*, "multiple family dwellings," "group houses" and "garden-type apartments" are permissible uses, and "boarding and rooming houses," as well.

It cannot be that motels are beyond effective regulation. They are now in general use throughout the country, providing in many areas reasonably priced, comfortable living facilities on a par with hotel service, in keeping with the highest standards of conduct—in many cases serving a distinct public need. See, *e. g., Summer Cottagers' Association of Cape May v. City of Cape May*, 19 *N. J.* 493 (1955);

also *Schermer v. Fremar Corporation*, 36 *N. J. Super.* 46 (*Ch. Div.* 1955)./ The fact that there are occasional operational faults and lapses does not justify the complete suppression of the use as a public nuisance, or otherwise a peremptory requirement in the essential public interest; there is no showing here that such is the case./ Compare *Menger v. Pass*, 367 *Pa.* 432, 80 *A.* 2*d* 702 (*Sup. Ct.* 1951). If and when the need arises, the police power may be exerted to supply the remedy.

*Duffcon Concrete Products v. Borough of Cresskill*, 1 *N. J.* 509 (1949), is not to the contrary. There, the ordinance excluded "all heavy industry" from a "small residential community * * * comprising about 1,300 acres and having a population of approximately 2,300 persons," divided into four zones, three entirely residential and the fourth, "D," for "commercial districts for business centers," all in "an effort to retain" the community's "residential character"; and the holding was that there is no constitutional or statutory principle enjoining a municipality in the adopting of a "comprehensive zoning scheme * * * to set apart a portion of its territory for heavy industrial use without regard to its suitability therefor," and "What may be the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its needs, present and reasonably prospective, but also on the nature of the entire region in which the municipality is located and the use to which the land in that region has been or may be put most advantageously." The Chief Justice continued:

"The effective development of a region should not and cannot be made to depend upon the adventitious location of municipal boundaries, often prescribed decades or even centuries ago, and based in many instances on considerations of geography, of commerce, or of politics that are no longer significant with respect to zoning. The direction of growth of residential areas on the one hand and of industrial concentration on the other refuses to be governed by such artificial lines;" "Sound social, economic and governmental policy dictates a separation, where possible, of residential areas and industrial areas."

Such is the *ratio decidendi* of Cresskill. There were geographical and physical characteristics of the area, situated as it is on the western slope of the Palisades, and "extensive bottom lands" of the valley available for industrial purposes, justifying the zoning scheme as comprehending, *R. S.* 40 :55–32, *supra*, "the most appropriate use of land throughout such municipality."

But here we have, by the supplement to the ordinance, not a regulation, but rather a prohibition of the motel use throughout the community, in a residence zone by express provision open to multiple-family dwellings, group houses, garden-type apartments, and boarding and rooming houses, and in the business and industrial zones as well; and so, I submit, the rule of the supplement is utterly unreasonable, arbitrary and discriminatory, at odds with the constitutional and statutory zoning policy and violative of the basic standards of due process and equal protection. See Professor Haar's penetrating analysis of the principles determinative of the issue of discrimination, *In Accordance with a Comprehensive Plan*, 68 *Harvard L. R.* 1154 (1955). Even motels of more than one story are banned. There is in all this no distinction of substance reasonably related to any of the constitutional and statutory considerations to be served by zoning; the classification is illusive and unreal. See *Weininger v. Borough of Metuchen*, 133 *N. J. L.* 544 (*Sup. Ct.* 1946), affirmed 134 *N. J. L.* 562 (*E. & A.* 1946); *First Church of Christ, Scientist v. Board of Adjustment of Newark*, 127 *N. J. L.* 325 (*Sup. Ct.* 1941), affirmed 128 *N. J. L.* 376 (*E. & A.* 1942); *Schnell v. Township Committee of Ocean*, 120 *N. J. L.* 194 (*Sup. Ct.* 1938); *Schmidt v. Board of Adjustment of Newark, supra.*

I would affirm the judgment.

OLIPHANT and BURLING, JJ., join in this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices WACHENFELD, JACOBS and BRENNAN—4.

*For affirmance*—Justices HEHER, OLIPHANT and BURLING—3.