51 N.J. Super. 239 (1958)
143 A.2d 778
MARGARET B. BARTLETT AND IRVING T. BARTLETT; AND STELLA M. GORE AND ROBERT T. GORE, PLAINTIFFS-APPELLANTS,
v.
TOWNSHIP OF MIDDLETOWN, IN THE COUNTY OF MONMOUTH; TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MIDDLETOWN; AND PLANNING BOARD OF THE TOWNSHIP OF MIDDLETOWN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 26, 1958.
Decided July 7, 1958.
*244 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Benjamin C. Van Tine argued the cause for appellants.
Mr. Lawrence A. Carton, Jr., argued the cause for respondents (Messrs. Roberts, Pillsbury & Carton, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs, four residents and taxpayers of the Township of Middletown, brought an action in lieu of prerogative writs seeking to set aside in its entirety an amendatory zoning ordinance adopted by the township on March 6, 1957, on the general ground that it did not represent a reasonable exercise of municipal power. Secondary legal issues raised in their complaint and amended complaint dealt with the propriety of the township's appropriation and expenditure of funds under its 1956 budget for a "master plan," and with the nature of defendants' authority to adopt such a plan. There was an extended trial before the Law Division judge sitting without a jury, at the end of which he delivered an oral opinion finding in defendants' favor. The judgment under appeal followed, dismissing the complaint and amended complaint because plaintiffs had failed to sustain their burden of establishing that the amendatory zoning ordinance was arbitrary or unreasonable. The judgment also declared that the question raised by plaintiffs as to the nature of defendants' authority to adopt a master plan, or any land use map in connection therewith, was academic and involved hypothetical questions not presently in issue or requiring judicial construction; and that the legality of the *245 appropriation and expenditure for the master plan was not pertinent to the validity of the amendatory ordinance and should not be determined in the proceeding.
We have reviewed in detail the extensive record of testimony compiled in the trial court, the zoning history and ordinances of Middletown Township, and particularly the 70-odd exhibits introduced in evidence, consisting of extensive excerpts from the minutes of the township committee and township planning board, reports, zoning maps, photographs and aerial views. A complete factual picture would require a prohibitively long exposition; nevertheless, a much more detailed treatment of the facts than is ordinarily attempted in a zoning opinion seems advisable.

I.
Middletown Township is a large, roughly triangular-shaped municipality in Monmouth County covering about 38 square miles and extending from Sandy Hook Bay and the Boroughs of Highlands, Atlantic Highlands and Keansburg on the north to the Navesink River on the east and southeast. To the west are Raritan and Holmdel Townships, and on the south Atlantic Township and the Borough of New Shrewsbury. The main arteries of travel are Route 36, a two-lane state highway extending east-west through the northerly section of the township and running generally parallel to the shoreline of Sandy Hook Bay, and Route 35, a four-lane state highway, bisecting the township and running in a northwest-southeast direction for a distance of about 5.7 miles. Route 35 extends from Woodbridge to the north, to the Brielle Circle on the south and, except for the Garden State Parkway opened in 1954, is the principal highway through Monmouth County.
Until recent years Middletown Township was primarily a rural county, with most of its area devoted to farms and estates. There were a number of small, built-up, all-year residential areas scattered through its middle and western parts. Along Sandy Hook Bay and the north side of Route 36 are the communities known as East Keansburg, Port Monmouth, Belford and Leonardo, populated in great measure *246 by summer residents. None has a substantial business area, although each is serviced by neighborhood stores. Such commercial and light industrial enterprises as existed were located primarily along the state highways.
The township has experienced a phenomenal growth in the past two decades. Its permanent population has increased from 11,000 in 1940 to 16,000 in 1950, and at the time of the trial was estimated to be in excess of 30,000. The population growth of surrounding municipalities has also been quite substantial. There had been a steadily increasing influx of people before the opening of the Garden State Parkway; thereafter there was a veritable surge of new population. The rapidly changing characteristics of the community are best highlighted by the statistics relating to building permits issued by the township since 1950. In that year there were 321 permits for new homes; in 1951, 1952 and 1953 there were 410, 361 and 370 permits issued, respectively; in 1954 building permits for new homes numbered 1,272, and in 1955 some 1,474 additional permits were issued. Whereas building permits for commercial or business buildings having an estimated value of $86,000 were issued in 1951, the figure for 1955 was $634,000.
Up to 1954 a large portion of the new residential development took place in the area west of the established communities on the Bay shore and east of Route 35, although there was considerable residential development in the western sector of the township. The northeastern area, insofar as it is suitable and zoned for large-scale residential subdivisions, has now been substantially utilized. As a result, a large proportion of the subdivisions approved since the creation of the township planning board  this took place in 1954  have been in the area east of Route 35. It is generally conceded that future residential development must take place in the area west of that highway. Land use studies and a survey made by Rutgers University for the local board of education in 1955 shows the course of development to be from east to west. The tremendous population growth in the township has produced a $4,520,000 school expansion *247 building program, the Rutgers survey projecting a total program by 1959 costing some $13,000,000.
With the exception of a short stretch immediately north of the Navesink River, almost none of the Route 35 frontage has been or is now used for residential purposes. Prior to the opening of the Garden State Parkway, Route 35 was the main highway through Middletown Township to the shore from the metropolitan area lying to the north. Its traffic pattern was primarily through-traffic, and the businesses established along both sides of the highway were designed to accommodate that traffic, the business growth taking place to a large degree on the east or north-bound side of the highway, because of the traveling public's habit of making purchases on the return trip to the metropolitan area. These business establishments were generally of a roadside stand or simple character; some could properly be characterized as light industrial in nature. Ordinarily, they extended to a depth of not more than a few hundred feet. Much of the property fronting on the highway remained vacant and a considerable part comprised large tracts of open farmland.
This traffic pattern and the character of use along Route 35 changed radically after the opening of the Garden State Parkway in the summer of 1954. Traffic now became predominantly local and, to some extent, regional, reflecting the diversion of some of the through-traffic to the Parkway and the great increase in local traffic resulting from the unusual growth in local population. A traffic count showed a daily average of from 18,000 to 24,000 vehicles.
Prior to the adoption of the challenged zoning amendment of March 6, 1957 the property on both sides of Route 35 was zoned for business use (Zone F) for substantially its entire length in the township. With only few exceptions the depth of this zone extended 200 feet from the highway on the west side and 400 feet on the east. Beyond these depths only a very small part of the property zoned residential was actually committed to such use. There were extensive areas of open, undeveloped land, and an examination of the aerial photographs shows that such is still the case in relatively large *248 measure. The principal areas actually used for residential purposes beyond the indicated depths were and are in the area on both sides of the highway for a little more than a mile north of Navesink River, the area on the west side of Route 35 comprising part of Middletown Village between its northerly terminus at Kings Highway and its southerly terminus at the Town Hall or "Five Corners" (located in mid-township), and a small area on the east side of the highway near "Five Corners" known as Middletown Estates.
The township's recent large influx of population has brought with it increasing activity along the highway. This is best reflected in the testimony of defendants' expert Lazarus, a realtor with an intimate knowledge of the entire highway area, who described to the trial court in considerable detail the great changes in the township along Route 35 since 1954. His recital of new business buildings included an insurance company branch office, gift shop, real estate office, Howard Johnson restaurant, professional building, rug and carpet sales building, dairy bar, modern gasoline and service station, firehouse, shoe store, screen and lumber store, modern bowling alley, real estate office and coffee shop, the Kislak Shopping Center comprising 11 to 14 acres, a large dial telephone building, ice cream stand, remodeled dry cleaning plant, the new Middletown Post Office, the Keansburg National Bank Building, and a super-market of 15,000 square feet known as the Food Circus. Photographs of these structures, all of them of a substantial character, are reproduced in defendants' supplemental appendix. Lazarus' testimony, dealing almost exclusively with the character of the highway area, its suitability for the uses permitted under the former ordinance as well as under the challenged amendment, and the effect of the new ordinance on neighboring residential areas, went virtually uncontradicted. It is of significance in evaluating plaintiffs' claim that there was no testimony supporting the need for the changes effected by the amendment, and their assertion that defendants had not even attempted to show that the character of the neighborhood had changed sufficiently to justify such amendment.
*249 Middletown adopted its original zoning ordinance in 1935. There was a general revision of the ordinance in October 1949; under it all of the highway area except residential tract C-4 was placed in zone H-undeveloped, which permitted any use "so long as it shall not be noxious or offensive by reason of odor, dust, smoke, gas or noise, or so long as it shall not be otherwise prohibited by law." C-4, a tract roughly rectangular in shape, was located 200 feet to the west of Route 35 and extended for some miles along its middle and northern portion, from the Naval Depot Railroad (intersecting Route 35) on the south to just north of Kings Highway on the north.
On August 14, 1950 the ordinance was amended to create  out of zone H-undeveloped  business tract F-13, an area 200 feet deep on the west side of the highway (this depth coincides exactly with the 200-foot area which theretofore separated residential tract C-4 from Route 35) and 400 feet deep on the east. This ordinance obviously followed the then popular concept of strip-zoning for business purposes. As developed by the testimony, the 200-foot depth on the west side was dictated by the fact that the area beyond had already largely been established for residential use, the topography did not readily lend itself to a greater depth for business purposes, and the eastern side of the highway was considered more desirable for business because of the traffic pattern we have referred to. Similar considerations controlled the fixing of the 400-foot depth on the east side: residential use had not in significant measure come within 400 feet of the highway, the topography permitted a greater depth for business use, and the traffic pattern called for a greater business depth.
Early in 1954 the area on both sides of the highway, from the township boundary on the north to Harmony Road about 3,750 feet to the south, was established as a business zone with a depth on both sides of 400 feet. At about the same time the area on both sides south of the Naval Depot Railroad was placed in a business zone with a depth of 200 feet on the west as far south as Iroquois Avenue and a depth *250 of 400 feet on the east as far south as Frost Avenue  a distance of about a mile according to the scale of the zoning map in evidence. A considerable area between the railroad and Fairview Road to the south, already established as a business area and used in part as a picnic grove and in part for a cemetery, was at that time extended westerly to a depth of better than 2,000 feet to the right-of-way of the New York and Long Branch Railroad which somewhat parallels Route 35.
As part of a general program, various areas in the township not previously zoned for residential purposes were, on March 10, 1954 and December 8, 1954, transferred from the H-undeveloped zone to B or C residence zones. These included some areas adjacent to the rear lines of the various boundaries of the business zones along Route 35. At the same time, certain areas previously zoned for residential purposes were transferred to more restricted residential zones.
Thereafter, on February 9, 1955 the depth of the business zone was increased by ordinance from 400 to 600 feet on the east side of the highway between Harmony Road and Tindall Road near the Town Hall or "Five Corners," except for a small section actually established for the Middletown Estates residential development, where the depth was decreased to 300 feet to coincide with the boundary of the development. Part of this area is presently used by the Kislak Shopping Center.
One month later, on March 9, 1955, the township committee approved a recommendation of the zoning board of adjustment permitting a small triangular tract of land along Mountain Hill Road (this road led into Route 35 from the east at the "Five Corners"), immediately to the east of the 400-foot business zone on that side of the highway, to be used for business purposes. Presently located in this area is the Food Circus super-market and a branch of the Keansburg National Bank.
Finally, on November 9, 1955 the township committee adopted a zoning amendment increasing the depth of the business zone on the so-called Allen tract, located on the *251 west side of the highway opposite the "Five Corners," from 200 to 800 feet for a distance of about 1,500 feet, this depth cutting into the previously established C-4 residential zone. Allen had in July 1955 requested that the depth be increased as to all of his 192 acres fronting some 3,000 feet on the west side of the highway. The validity of the November 9, 1955 ordinance was challenged by some of the plaintiffs in this action, together with others, with the result that the ordinance was set aside on the technical ground that the planning board had not first passed on the change in its entirety.

II.
We now come to the background of the challenged zoning amendment of March 6, 1957, as revealed by the official minutes of the local planning board and the township committee.
In March 1954 the township committee set up a nine-member planning board to consider the many problems created by the township's greatly increased population. At first the planning board interested itself in a study of possible industrial sites along or near Route 35, and the possibility of zoning the highway area to permit desirable industries to locate there. The matter was discussed with the township committee, but no action was taken. As early as January 24, 1955 we find the board considering the necessity for a comprehensive study of the township and the desirability of engaging professional planning consultants to assist in the project. On that date the board discussed with Director Pike of the Monmouth County Planning Board the basic requirements for such study, and it was agreed to procure the services of Rutgers University in the preparation of a land use map. Such a map was prepared under the auspices of the School of Engineering at the University, at the expense of the township. At a meeting in May following, Pike advised the board that if it intended to reserve a section for industry, it should designate that area and put it in an industrial zone. He met again with the planning board *252 on August 8, 1955, at which time he suggested that a committee be appointed to work out a master plan. At a regular meeting held September 12, 1955 the land use map prepared by Rutgers was displayed and explained and a master plan committee appointed.
Thereafter, the planning board met with the township committee to discuss a number of problems, at which time it was agreed that a professional consultant be engaged and that the board would interview three men. The board had already met with Charles K. Agle, a planning consultant, on November 21. It conferred with planning consultant Russell V. Black on December 19, 1955, and on January 16, 1956 it interviewed Herbert L. Smith, executive director of Community Planning Associates, Inc., of Princeton, regarding the preparation of a master plan and a planning study of the township. Thereafter the board met on January 23, 1956 and discussed the proposals submitted by the three planning consultants, with the result that a resolution was unanimously adopted recommending to the township committee the hiring of Community Planning Associates, Inc., at $17,500. On March 28, 1956 the township entered into a contract with that firm to perform the planning services required by the township in connection with its zoning and planning activities.
Before this contract was actually signed Community Planning Associates and its representative, Smith, had been informed that one of the most pressing problems in the planning program was the manner in which Route 35 should be treated. He was asked to give this problem top priority, and also to report on certain other special matters such as schools and municipal facilities. Community Planning Associates submitted its preliminary zoning study on May 7, 1956, which carefully analyzed the existing zoning ordinance, directed attention to its major weaknesses and particularly emphasized that the Route 35 area represented the most important zoning problem in the community. Among the weaknesses described was the existence of two rather substantial portions of the township designated as H-undeveloped *253 zones, the excessive use of strip commercial zoning, the fact that altogether too much land was zoned for business use, the inadequacy of the regulations and standards enumerated for residential and business zones, the large number of uses permitted in a business zone (almost any type of general manufacturing or industrial use would have to be allowed unless it was determined offensive or noxious), the very weak standards established for industrial zones, and the inadequacy of the section dealing with non-conforming uses. The planning consultants had made a special study of Route 35 and the properties adjacent to it; a study of community and regional and population trends, distribution, density and future growth expectation; a land use survey, and a comprehensive study of the whole of Middletown. The preliminary zoning study presented to the planning board contains the basic recommendations incorporated in the zoning amendment here under review.
Receipt of the zoning study set in motion an extended and intensive consideration of its recommendations and their particular application to the area in question, as well as many public meetings at which the proposed rezoning of the highway was discussed at length. The study was briefly considered at the regular meeting of the planning board on May 7, 1956 and then further discussed on June 14 when the board arranged for reprinting the map prepared by Community Planning Associates and a summary of the proposed zoning changes, and for their distribution. There was a lengthy public hearing on July 2, 1956, apparently attended by a large number of citizens who fully aired a great variety of views. The suggestions made were reviewed by the planning board at a special meeting of July 23. The board and the township committee then held a joint conference on August 6, at which time it was decided that various committees would meet with different groups of property owners along Route 35. The rezoning was further discussed by the planning board on September 10, and again at a special meeting two weeks later when a number of citizens were heard and it was decided to confer further with the township *254 attorney and representatives of Community Planning Associates. At a regular meeting on October 1 other members of the public expressed additional viewpoints on the rezoning of the highway, after which the board conferred with the planning consultants. The board then arranged for another public session on November 20, when a further lengthy hearing took place.
Finally, on December 3, 1956 the planning board formally adopted a resolution recommending to the township committee that it introduce an ordinance to rezone Route 35. The recommendation substantially followed the original proposal of the planning consultants, with a number of changes included. The township committee received the recommendation on December 12, heard a number of objections, and then regularly referred the matter for study to the township committee sitting as a committee of the whole.
The proposed zoning ordinance was finally introduced on January 23, 1957, incorporating the planning board recommendations. At the same time a sketch map was submitted showing the boundaries of the areas affected, as revised from the original proposal. The ordinance having duly been referred to the planning board for report, the board again considered it on February 4, heard from a number of interested citizens, and then adopted a seven-page resolution and report addressed to the township committee, unanimously approving the proposed legislation. The governing body conducted a lengthy public hearing on February 27, at which time it considered the report of the planning board and several petitions of protest, and heard from quite a number of citizens who spoke for and against the ordinance. The hearing was continued on March 6, when further speeches and representations for and against the ordinance were heard and considered. At the close of the hearing the ordinance under review was unanimously adopted.

III.
The amendatory ordinance deals comprehensively with the problem of rezoning Route 35 in order to meet the greatly *255 changed conditions in the township. It recites that "it is deemed essential to the general welfare to see that every effort is made to protect highway frontage from haphazard development"; speaks of certain traffic problems, and states that "it is imperative that the Township provide for well planned business and industrial development which, by the nature of its use, must be related to the highway and transportation arteries; and that such uses can be properly and compatibly intermixed with the normal agricultural and residential uses only under special standards and by proper guidance from local authorities."
Examination of the township zoning map as it stood on January 1, 1955 shows, as has already been made evident, that Route 35 was at that time strip-zoned and classified as business zone F for almost its entire length, from the northwestern boundary of the township southeastwardly to a point about 3,000 feet from the Navesink River. The depth of this zone was for the most part 200 feet on the west side and 400 feet on the east, except along those sections already mentioned: on the west side the depth was 400 feet from Harmony Road north to the township line, and there was also the large area running from the Naval Depot Railroad south to Fairview Road; on the east side the depth was 600 feet from Middletown Estates near "Five Corners" north to Harmony Road.
The new ordinance created two new zones, business retail (FBR), consisting of 11 different tracts, and business commercial (FBC), made up of eight tracts. The zoning amendment transferred all of former business zone F, beginning at a point 100 feet north of Frost Avenue near the southern end of the highway, into these two zones. In a general way, the business retail zones approximated in many areas the depth of former business zone F. The depth of the eight larger areas reclassified as business commercial zones was generally increased to 800 feet. Examination of the several maps and aerial views in evidence shows that these tracts were fitted into areas along the highway not already substantially committed to retail business; where the depth was *256 increased, the zone did not involve land already actually being used for residential purposes.
Under the township zoning ordinance as it stood on January 1, 1955 there were no minimum requirements in former business zone F as to frontage, depth, land area, building area, setbacks, front yard, side yard, off-street parking or signs. The section setting out the regulations controlling zone F merely prohibited certain uses, 13 in number, including those prohibited in an industrial zone. A very wide variety of trades, industries and uses was permitted. The amendatory ordinance of March 6, 1957 exhibits an entirely different concept of zoning. The use regulations controlling the new business retail zone provide for a minimum highway frontage of 100 feet, minimum lot size of 20,000 square feet, minimum size of structure of 1,000 square feet and lot coverage of 30%, minimum setback and yard requirements, minimum building height of 28 feet and strict regulations of entrances for highway safety, off-street parking and signs. Certain uses were specifically excluded, such as drive-in theatres and amusement devices, commercial public auctions, golf driving ranges, junk yards, used car lots, trailer parks, and manufacturing or processing of raw materials.
The new business commercial zone was designed to permit, under strictly controlled conditions, office buildings for executive or administrative purposes, scientific or research laboratories, integrated regional shopping centers, and light industrial uses not "noxious or injurious to adjacent properties." Prohibited were the same uses as were not permitted in the business retail zone. Standards and requirements for a business commercial zone were a minimum highway frontage of 500 feet, minimum lot size of ten acres, maximum lot coverage of 20% of the entire area with 20% of the area to be seeded and graded, maximum building height of 50 feet, safety provisions through controlled access to the highway and required off-street parking, regulation of signs, etc. Among the more important provisions controlling the business commercial zone was one calling for site plan review.

*257 IV.
Plaintiffs argue that the amendatory zoning ordinance is invalid because (1) where areas have recently been restricted to residential use and thereafter large investments made in lands and homes in such areas, the zoning restrictions must stand until changing conditions dictate otherwise, and the burden of proving the need for change is upon the party advocating it; (2) before the proposed zoning changes would be justified in the highway area in question, defendants must not only show a public need in the township but that such need can only be satisfied by using areas heretofore zoned residential; (3) the ordinance under review constitutes spot zoning with respect to changes made in the residential tracts, part of which have been rezoned business retail or business commercial; (4) the amendatory ordinance is discriminatory with respect to the creation of so-called "buffer" areas; (5) the manner in which the changes in question were effected was contrary to public policy, and the resultant action therefore void; (6) the public welfare requires that the changes in use classification be not permitted at the locations in question; (7) economic considerations will not justify a zoning change that contravenes constitutional and statutory principles of zoning; and finally (8) the amendatory ordinance denies equal protection of the laws and due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution.
The counter-argument of defendants, briefly summarized, is that (1) the Legislature has conferred wide power and discretion upon municipalities to make and amend zoning ordinances; (2) the amendatory ordinance adopted pursuant to this grant of power is vested with a strong presumption of validity which the courts may not set aside in the absence of an affirmative showing by plaintiffs that it is arbitrary or unreasonable; (3) changing conditions in the township justify the determination of the governing body that the needs of the community require that the local zoning ordinance be amended; and (4) plaintiffs have failed to meet *258 their burden of showing that the amendatory ordinance is arbitrary or unreasonable.
The zoning powers of municipalities have been extended by Art. IV, Sec. VI, par. 2 of the 1947 State Constitution:
"The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature." (Italics ours.)
Following the adoption of the new Constitution the zoning statutes then in effect were amended by L. 1948, c. 305, to give effect to the expanded zoning power contemplated by the addition of the italicized words to the corresponding provision of the 1844 Constitution.
Art. IV, Sec. VII, par. 11 of the 1947 Constitution provided for the first time that the constitutional and statutory provisions pertaining to municipal powers, including zoning, are to be construed liberally in favor of a municipality:
"The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law."
N.J.S.A. 40:55-31 provides that:
"For any or all of said purposes the governing body or board of public works may divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes of this article, and it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings or other structures, and the nature and extent of the uses of land, within such districts."
*259 This section must be read in connection with R.S. 40:55-32, setting out the purposes of zoning:
"Such regulations shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."
Commenting upon the constitutional and statutory provisions just quoted, our Supreme Court in Lionshead Lake, Inc., v. Wayne Township, 10 N.J. 165, 172 (1952), said:
"* * * To the traditional presumption with respect to the validity of every legislative act there has been added, moreover, the constitutional mandate to construe such legislation liberally in favor of the municipalities * * * We are bound by these changes in the organic law and accordingly this court in Schmidt v. Board of Adjustment of the City of Newark, 9 N.J. 405 (1952), has held that so long as the zoning ordinance was reasonably designed, by whatever means, to further the advancement of a community as a social, economic and political unit, it is in the general welfare and therefore a proper exercise of the zoning power * * *." (Italics ours.)
The court in that case was considering a revision of the zoning ordinance of Wayne Township, and after noting that the municipality was still for the most part a sparsely settled countryside which obviously lay "in the path of the next onward wave of suburban development," it went on to say that
"* * * Whether that development shall be `with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality' and whether it will `prevent the overcrowding of land or buildings' and `avoid undue concentration of population' depends in large measure on the wisdom of the governing body of the municipality as expressed in its zoning ordinance. It requires as much official watchfulness to anticipate and prevent suburban blight as it does to eradicate city slums."
*260 The great weight to be given to the considered judgment of a local governing body as to the zoning restrictions best suitable to the municipality was emphasized in Justice Jacobs' concurring opinion in Lionshead when he spoke of the legislative action there under review as "representing the governing body's best judgment as to what zoning restrictions were required to promote the health, morals and general welfare of the community as a whole." He added that: "Decent respect for its problems and sincerity required that its action remain unimpaired in the absence of clear showing that it was arbitrary, unreasonable, or beyond the authority of the general Zoning Act." This basic approach to local zoning action is reflected in the recent statement of now Chief Justice Weintraub, when he said in Kozesnik v. Montgomery Township, 24 N.J. 154, 167 (1957):
"The zoning statute delegates legislative power to local government. The judiciary of course cannot exercise that power directly, nor indirectly by measuring the policy determination by a judge's private view. The wisdom of legislative action is reviewable only at the polls. The judicial role is tightly circumscribed. We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable."
The rule was iterated in Fanale v. Borough of Hasbrouck Heights, 26 N.J. 320, 327 (1958), a case which dealt with an attack upon a zoning ordinance supplement prohibiting erection of multiple-family dwellings anywhere in defendant borough. The court held that, keeping in mind the problem of congestion and the impact of multi-family structures upon abutting one-family homes, it could not condemn the local legislative decision as arbitrary: "The issue before the governing body was fairly debatable, and that being so, the judiciary cannot quarrel with the result." This final comment accords with what Justice Heher, speaking for the Supreme Court, said in Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405, 416 (1952):
"* * * A police regulation that goes beyond the public need is not effective to curtail the basic rights of person or of private property made the subject of constitutional guarantees. But where *261 the subject is comprehended in the police power of the state, debatable questions as to the reasonableness of the measure are not for judicial cognizance * * * If, for example the validity of a zoning classification be fairly debatable, the legislative judgment prevails."
And see Struyk v. Samuel Braen's Sons, 17 N.J. Super. 1, 8 (App. Div. 1951); Clary v. Borough of Eatontown, 41 N.J. Super. 47, 69 (App. Div. 1956).
Plaintiffs' argument proceeds on the basis that there was a presumption running in favor of the zoning ordinance as it stood before the amendment, and this "existing presumption" of validity had to be overcome before it could be said that there was a "subsequent presumption" in favor of the amendatory ordinance. The short answer to this is that the presumption of validity attending the original ordinance must give way to the presumption of the correctness of the amendatory ordinance. The Legislature not only conferred upon municipalities the power to adopt zoning ordinances, but also the power to amend, change, modify or repeal them, and to change the boundaries of districts from time to time, provided that the amendatory ordinance should first have been submitted to the planning board and been approved by it. N.J.S.A. 40:55-35. Some of the cases we have referred to in discussing the presumption of validity that attaches to local zoning legislation, dealt specifically with amendments or supplements to original zoning ordinances, e.g., Fanale v. Borough of Hasbrouck Heights; Kozesnik v. Montgomery Township; Lionshead Lake, Inc., v. Wayne Township. And see Hochberg v. Borough of Freehold, 40 N.J. Super. 276, 290 (App. Div. 1956), certification denied 22 N.J. 223 (1956), where Judge Clapp said of zoning ordinance amendment which would have changed from a residential zone to a business zone a 26-acre tract containing part of a racetrack (a prior non-conforming use) and other largely unimproved property, to permit enlargement of racetrack facilities:
"* * * We have some doubts; but when in doubt, we sustain. Among other factors above stated, it must be borne in mind that *262 this is distinctively a highway property, integrated with commercial property in the township.
Indeed, we should always be most reluctant to interfere with the legislative process, whether at the municipal or higher level. Our conclusion is that an amendment such as this, properly acted upon by the planning board and duly adopted by the borough council, could not be deemed to be so clearly contrary to the broad community zoning aims of the borough as to require us to nullify it.
The burden rests on a party attacking an ordinance to rebut the presumption of validity which attaches to it. Fischer v. Township of Bedminster, 11 N.J. 194, 204 (1952), Cobble Close Farm v. Board of Adjustment of Middletown Tp., 10 N.J. 442, 451 (1952); but, to succeed, he must establish manifest abuse. Ward v. Scott, 16 N.J. 16, 23 (1954)."
The amendatory ordinance was set aside, however, because of the self-interest of one member of the planning board.
It is axiomatic that zoning cannot be static; it must look to the future and recognize changing conditions. Lionshead Lake, Inc., v. Wayne Township, above, 10 N.J. at pages 172, 173. Although stability and regularity, as plaintiffs argue, are undoubtedly essential to the operation of a zoning plan, a zoning ordinance is not immutable:
"* * * Changed or changing conditions call for changed plans, and persons owning property in a particular zone or use district are not possessed with a vested right to that classification, if the public interest demands otherwise. The power of a municipality to amend its basic zoning ordinance in such a way as reasonably to promote the general welfare cannot be questioned. The decision as to how a community shall be zoned or rezoned, as to how various properties shall be classified or reclassified, rests with the local legislative body; its judgment and determination is presumed to be reasonable and valid, [and] will be conclusive, beyond interference from the courts, unless shown to be arbitrary, unreasonable or capricious. The burden of rebutting this presumption and establishing such arbitrariness is imposed upon him who asserts it [citing cases]." Jones v. Zoning Board of Adjustment, Long Beach Tp., 32 N.J. Super. 397, 405 (App. Div. 1954), holding amendatory zoning ordinance valid.
Physical, economic and social conditions determine what may be the most appropriate use of particular property in a municipality. What is the most appropriate use also depends on the needs of the municipality, present and reasonably prospective, on the nature of the entire region where the *263 municipality is located, and the use to which land in that region has been or may most advantageously be put. Duffcon Concrete Products, Inc., v. Borough of Cresskill, 1 N.J. 509, 513 (1949) (Vanderbilt, C.J.).
Where a zoning ordinance may fairly be said to have as its objects the preservation of the character of the community, the maintenance of property values and the devotion of land throughout the municipality to its most appropriate use, such legislation finds ample justification under our State Constitution and the Zoning Act, and is beyond attack. It may not be insisted that such ordinance provide the ultimate zoning pattern; all that is required is that the ordinance be reasonable in the light of existing conditions and planning problems. Should changed conditions in the future prove the zoning arrangement to be no longer reasonable or workable, it may be changed. Fischer v. Bedminster Tp., above, 11 N.J. at page 205; Pierro v. Baxendale, 20 N.J. 17, 29 (1955); Kozesnik v. Montgomery Tp., above, 24 N.J. at page 167.
Applying the principles established in our cases to the present situation, we find the Middletown Township amendatory zoning ordinance valid. The governing body and the planning board adopted the zoning pattern embodied in the ordinance after deliberate and far-ranging consideration of present conditions and municipal needs.
The record clearly establishes that Middletown Township is undergoing a dramatic change  a change which will continue into the foreseeable future. The great influx of population is daily altering the rural character of the township, and this change has been particularly noticeable since the opening of the Garden State Parkway in the summer of 1954, the year the planning board was created. Not only is the entire community changing, but the traffic pattern along Route 35 and the characteristics of property on the margin of that highway are changing. With the absence of a centralized business or shopping area to serve the entire township, the highway is a logical area where the necessary facilities may be made available to township residents. The governing *264 body has also determined that Route 35 is the logical location for office buildings, research centers, integrated shopping centers and light industry, all carefully restricted.
Faced by the mass exodus of city residents to the shore area, and particularly Middletown Township, the governing body at first amended the local zoning ordinance on an ad hoc basis, strip-zoning the highway and carving residential zones out of the spacious H-undeveloped rural areas of the community. After the planning board was created its main concern, from the very beginning, was the planning and zoning aspects of Route 35. There followed many board meetings where the subject was discussed, a number of joint meetings of the board and township committee, several public hearings, conferences with the county planning board director, and a land use survey by Rutgers University. Then came the practical and necessary step of engaging the assistance of the planning consultants who, after extensive studies, which included population data, personal inspection of the township, consideration of traffic problems and the character of the land, presented a zoning plan which recognized that treatment of the lands along the highway was the key to many of the planning and zoning problems facing the township. Our extended exposition of the factual background of the amendatory zoning ordinance makes obvious that Route 35 was given, and received, top priority from township officials and planning consultants alike. Ultimately, after extended study, public discussion and numerous official conferences, there emerged the ordinance under review, representing the carefully considered judgment of the responsible township officials as to the needs and best interests of the entire community as well as the area immediately adjoining Route 35.
We cannot say that the ordinance of March 6, 1957, the product of so much time and thoughtful study on the part of conscientious municipal officials, represents an arbitrary, capricious or unreasonable exercise of the zoning power entrusted to them. They appear to have approached their problem realistically and with a full appreciation of not only *265 the present interests of the local residents, but the future welfare of the township. It is appropriate that we give due consideration to the superior knowledge and information which local officials possess as to the needs of their municipality. This thought was well expressed by Justice Jacobs in Ward v. Scott, above, 16 N.J. at page 23, and although he was speaking there of a variance, what he said is even more appropriate when applied to the township's legislative action in amending its zoning ordinance:
"* * * Local officials who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people, are undoubtedly the best equipped to pass initially on such applications for variance. And their determinations should not be approached with a general feeling of suspicion, for as Justice Holmes has properly admonished: `Universal distrust creates universal incompetence.' Graham v. United States, 231 U.S. 474, 480, 34 S.Ct. 148, 151, 58 L.Ed. 319, 324 (1913). Where, as here, the application for variance has been given careful and conscientious consideration by the zoning board and the town council and has been acted upon by both of them in strict conformity with the procedural and substantive terms of the statute, the ultimate interests of effective zoning will be advanced by permitting the action of the municipal officials to stand, in the absence of an affirmative showing that it was manifestly in abuse of their discretionary authority. * * *"
Plaintiffs claim the township committee had no right to establish the several business retail and business commercial zones because, in doing so, they took away parts of areas previously placed in a residential classification. This argument assumes that once an area has been classified residential, it takes on a fixed designation which cannot be changed unless conditions "dictate" otherwise. But this ignores the fact that conditions here do so dictate, as is made manifest by a reading of the record. The argument also assumes that the three or four areas to which they point have already been put to residential use. True, they had been zoned for residential use, but the parts which are now included in the business retail and business commercial zones under the amendatory ordinance have never been put to residential use. *266 No homes are built on the lands so transferred to the new zones; these zones come up to, but do not enter upon, areas where there are residences.
Actually, the complaint is that the new zones come too near some of the residential developments, and that too great an area has been set aside for business retail and business commercial zones. But such zoning lay in the wisdom, knowledge and competence of the local governing body, and unless the proofs clearly show that its action was arbitrary, unreasonable or capricious, the amendatory order must stand. Zoning regulations are not to be formulated or applied with the design to encourage the most appropriate use of plaintiffs' particular property, but rather "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality." Cobble Close Farm v. Board of Adjustment of Middletown Tp., 10 N.J. 442, 452 (1952). Plaintiffs' argument resembles that made in Clary v. Borough of Eatontown, above, where the attack was upon a zoning ordinance effecting a wide-spread revision of residential zoning throughout the municipality. We said there (41 N.J. Super. at page 64), quoting from Raskin v. Town of Morristown, 21 N.J. 180, 196 (1956), that the standard is not the advantage or detriment to particular neighboring landowners "but rather the effect on the entire community as a social, economic and political unit."
Plaintiffs claim, specifically, that the zoning changes effected by the ordinance under attack will destroy the integrity of residential tracts B-8, located on the east side of Route 35 south of the Naval Depot Railroad; C-4 and C-10, located on the west side at the northern end of the highway; and C-14 and C-15, located across from them on the east side  and this because of the proximity of some of the newly established business commercial zones. We have already pointed out that the relatively small portions of these former residence zones now included in the new business commercial *267 zones were and still are vacant and undeveloped lands. The large areas of B-8, C-4, C-10, C-14 and C-15 lying behind the business commercial zones have, in fact, benefited by the strict limitations which have been placed upon the uses permitted in the latter. It is to be recalled that the ordinance of March 6, 1957 requires a minimum of ten acres in the FBC zone; not more than 20% of the plot may be used for structures; no structure is permitted nearer than 100 feet from any property line or 200 feet from any existing residential dwelling. We have referred to the strict regulation of signs, off-street parking, building height. The very residential areas which plaintiffs now claim are unfavorably influenced by the business commercial zones along the highway were formerly adjacent to the F business zone where all types of business structures and industrial uses were permitted as close to the rear boundary line as the owner wanted; no landscaping was required; there was no minimum building area, regulation of signs, access or off-street parking  indeed, there was a minimum of regulation. If anything, the situation of those living in the mentioned residential zones has been vastly improved by the newly imposed, strict limitations upon business commercial uses.
As defendants properly note, when various areas in the township not previously zoned for residential purposes were, on March 10, 1954, transferred from the H-undeveloped zone to B or C residence zones, there was no planning board functioning, no planning consultants had been engaged, the Garden State Parkway was not yet opened, and the conditions now confronting the municipality had not yet fully developed. The situation had not significantly changed when other areas were transferred out of the H-undeveloped zone to residence zones on December 8, 1954. The present zoning amendment represents a conscientious and long considered plan to solve the problems that have arisen in the past half decade or so, in the light of experience and intense study. We therefore find no merit in plaintiffs' claim that there has been no showing of changed conditions or of public need justifying the zoning changes.

*268 V.
We turn to the contentions advanced by plaintiffs that the ordinance under review is not in accordance with a comprehensive plan, constitutes spot zoning and is discriminatory.
Directly involved is R.S. 40:55-32, which requires that zoning regulations "be in accordance with a comprehensive plan," designed to promote the specific purposes therein enumerated relating generally to the health, safety and general welfare of the community. Such regulations must be made "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality." The reason for the statutory requirement of a "comprehensive plan" is to avoid an arbitrary, unreasonable or capricious exercise of the zoning power, resulting in haphazard or piecemeal zoning. Speakman v. Mayor, etc., North Plainfield, 8 N.J. 250, 256 (1951); Kozesnik v. Montgomery Tp., above, 24 N.J. at page 166.
Our courts have many times addressed themselves to the question of what constitutes a "comprehensive plan." The most recent pronouncement is that by Chief Justice Weintraub in the Kozesnik case, above, where he said (24 N.J. at page 166):
"* * * Without venturing an exact definition, it may be said for present purposes that `plan' connotes an integrated product of a rational process and `comprehensive' requires something beyond a piecemeal approach, both to be revealed by the ordinance considered in relation to the physical facts and the purposes authorized by R.S. 40:55-32. Such being the requirements of a comprehensive plan, no reason is perceived why we should infer the Legislature intended by necessary implication that the comprehensive plan be portrayed in some physical form outside the ordinance itself. A plan may readily be revealed in an end-product  here the zoning ordinance  and no more is required by the statute."
He further pointed out that a comprehensive plan is mutable and that if events prove that the plan did not fully *269 or correctly meet or anticipate the needs of the total community, amendments could be made, citing with approval Hochberg v. Borough of Freehold, above, 40 N.J. Super. 276 (App. Div. 1956). In Hochberg Judge Clapp also considered the meaning of the phrase "comprehensive plan" and said:
"* * * It ["comprehensive plan"] hardly seems to have reference just to the plan embodied in the zoning ordinance itself, because then the zoning scheme would be frozen and beyond amendment. The zoning law looks toward a stable * * * but not a static or unchangeable community. * * *
The term `comprehensive plan' therefore signifies something other than the preexisting zone plan. Moreover, it has significance, even though, as in the case of the Borough of Freehold, there is no formal master plan. * * *

* * * * * * * *
A comprehensive plan, like the process known as municipal planning, should take account of the variant interests affecting the physical layout of the community, accommodating them to the interest of the community as a social unit. * * *
So far as the present case goes, we may say then that a comprehensive plan involves at least this  a comprehensive outlook on the community welfare as a whole, both at present and in the foreseeable future. * * *" (40 N.J. Super. at page 286)
The present amendatory ordinance meets the criterion of these cases in every respect. There can be no question that the governing body, like the planning board, considered the views of the citizenry and took into account the many different interests of virtually hundreds of property owners and residents in the Route 35 area, as well as the development of the highway in relation to the rest of the township. They obviously recognized the pressing need of setting aside an area which would accommodate the business and shopping needs of the rapidly increasing population, as well as the reasonably anticipated demand for such facilities as are permitted in the new business commercial zones. All this is made clear by a consideration of the various reports and from an inspection of the minutes of the planning board and the township committee. The ordinance presents a clearly defined comprehensive plan, as called for by the statute.
*270 Nor do we see any merit in plaintiffs' claim of spot zoning. What the ordinance does is to classify the frontage along both sides of Route 35 for about five miles, formerly zoned for business uses, into two new business zones  business retail and business commercial, each comprising a number of tracts. The regulations for each type of tract are identical. Zone boundaries are precisely defined, and they take into account the physical characteristics of the several areas and the nature and use of adjacent properties, as is made manifest by an examination of the maps and aerial views submitted as part of the record.
Spot zoning has been defined as "a process of singling out a small parcel of land for use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners," and as the very opposite of planned zoning. Where an ordinance is enacted in accordance with a comprehensive zone plan, there is no spot zoning. Jones v. Zoning Bd. of Adjustment, Long Beach Tp., 32 N.J. Super. 397, 404 (App. Div. 1954). That case cited Borough of Cresskill v. Borough of Dumont, 15 N.J. 238 (1954), where the late Chief Justice Vanderbilt (at page 249) stated the test to be whether the zoning change in question was made "with the purpose or effect of establishing or furthering a comprehensive zoning scheme calculated to achieve the statutory objectives," or whether it was "designed merely to relieve the lot of the burden of the restriction of the general regulation by reason of conditions alleged to cause such regulation to bear with particular harshness upon it." If the latter, the ordinance is invalid as spot zoning and not in accordance with a comprehensive plan.
The present ordinance is the antithesis of spot zoning. No property is singled out for favored treatment; all properties similarly situated carry the same burden of restrictions. The new zoning pattern, as we have said, applies over the entire five-mile margin of Route 35, and patently exhibits every characteristic of a comprehensive plan.
*271 The charge of discrimination which plaintiffs level against the ordinance is that buffer zones were created between FBC zone 4 and Applebrook Farms (north of the Naval Depot Railroad) and between FBC zone 8 and Brookview Estates near the northern end of the highway. The southern boundary of FBC zone 4 was changed from that originally planned so that it now is at some distance from Applebrook Farms. However, the area between contains over two dozen dwellings, so that without the change they would have found themselves in a business commercial zone. Further, there were topographical reasons requiring this treatment of the area. Similarly as to the area that was left between FBC zone 8 and Brookview Estates, where the zone as originally proposed would have partially encircled the existing housing development.
Plaintiffs stress the testimony of the planning board chairman who said that the board felt that both these housing developments were "entitled perhaps to a little different environment than they might well have under this plan." We cannot consider this statement as by itself spelling out discrimination. The action of the planning board, and later the formal action of the governing body, was based upon firsthand knowledge of all of the property involved in the ordinance, tract by tract, each of which was taken into consideration before final passage of the ordinance. The placing of the eight different FBC zones and the definition of their boundaries lay well within the governing body's zoning power. We cannot say, on a review of the entire zoning pattern, that its discretion was arbitrarily or unfairly exercised.
Plaintiffs' real complaint is actually with the location of the business commercial zone boundary lines. The fact that there is a small area of undeveloped land between FBC zones 4 and 8 and the two developments in question takes on no special significance in view of the fact that there exist similar open undeveloped areas of greater depth between the rear boundaries of other FBC tracts and housing developments nearby. Further, under the amendatory ordinance, existing residential developments are more than adequately *272 safeguarded by the highly restrictive regulations applying to FBC zones generally. These restrictions, including the one which prohibits any structure within 200 feet of a residence, and the landscaping provision, in themselves create a separation from commercial buildings. In addition there are, in some instances, certain natural barriers and topographical features that protect property owners.

VI.
Plaintiffs make the further point that the zoning ordinance under review was primarily inspired by the desire of the township officials to aid the owners of the so-called Allen tract in establishing a shopping center on their property near "Five Corners," and hence the amendment is invalid. We referred to the Allen property very early in this opinion. It appears that in July 1955 Allen informed Mayor Blaisdel that he wanted to erect a shopping center on his property on the west side of Route 35 near "Five Corners" and desired that his proposal be submitted to the planning board to see if they thought it desirable. The board reviewed the project favorably and eventually recommended a change in the business zone from 200 to 800 feet depth. In due course an ordinance increasing the business depth to 800 feet for the entire length of the Allen property was passed on first reading and submitted to the planning board. The board approved the zoning change for a lesser frontage and included a recommendation for a proviso limiting the use to a shopping center. Early in November 1955 the township committee adopted an amendatory ordinance increasing the business depth from 200 to 800 feet over the shorter frontage, but without the shopping center limitation and without further submission to the planning board. An action was immediately instituted to test the validity of that ordinance. The governing body authorized the defense of the action and further authorized the township attorney to negotiate with Allen for the latter to pay part of the costs of the litigation. Herbert L. Smith, of Community Planning Associates, Inc., *273 was engaged by the township to testify as its expert. Allen had nothing to do with the arrangement for Smith's services, nor was there any prior agreement to pay for these services or to share in the litigation costs. The ordinance was eventually set aside on technical grounds. After the litigation was over Allen paid the voucher submitted to the township committee by Smith for his services.
As we have noted, the planning board initiated its master plan study in 1955 and, after interviewing three prominent planning consultant firms, including Community Planning Associates, Inc., represented by Smith, engaged that firm to make the study. We have also remarked that the zoning treatment of Route 35 was assigned top priority as the key feature of this study. It is plaintiffs' contention that Community Planning Associates, Inc., could not possibly objectively advise on the zoning of Route 35 in view of Smith's participation in the defense of the so-called Allen ordinance; that the retention of that firm was contrary to public policy; that the zoning changes in question were made primarily to accommodate the Allen tract, and therefore the entire amendatory ordinance is vitiated. We do not so view the matter.
Aside from plaintiffs' mere outline of Smith's participation in the Allen ordinance litigation, there is nothing in the record of this case to support their accusation. The fact remains that the Allen property is but one of many equally valuable properties along the highway, and it received the same treatment as the others. The inclusion of much of the Allen tract frontage in one of the business commercial zones was entirely in keeping with the general zoning pattern developed by the planning consultants, planning board and township committee. True, the ultimate zoning pattern coincided with the Allen interests, but this constituted only a minor part of the entire zoning change effected by the amendatory ordinance. It did not render the action of the township committee corrupt or improper. We note here the language of the Supreme Court in a similar situation in the Kozesnik case, above, 24 N.J. at page 173, where the plaintiffs *274 sought to support their attack upon the ordinance there in question by emphasizing the fact that it conformed to the proposal of the Minnesota Mining and Manufacturing Company. The court observed:
"* * * That it does is not in itself a vitiating circumstance. * * * If the purpose is solely to serve the private interests of the owner, there is a perversion of power, but if the intention is to further the welfare of the entire municipality as part of a comprehensive plan (we have said that a legislative finding to that effect must here be upheld), it is of no moment that private interests are simultaneously benefited."
Cf. Gartland v. Borough of Maywood, 45 N.J. Super. 1 (App. Div. 1957), where the complaint was that the amendatory ordinance rezoning for business use a small area previously zoned for residential use, had been tailored to the requirements of a shopping center which the objectors claimed intruded upon an established residential area. The amendment was upheld.

VII.
In light of what we have said, we find no merit in the argument of plaintiffs that the public welfare requires that the zoning changes not be permitted, that economic considerations will not justify a zoning change (incidentally, we find nothing in the record to indicate that the purpose of the amendatory ordinance was to increase ratables, or for other local economic considerations), and that the action of the township committee denies the property owners in the area the equal protection of the laws and due process of law, as guaranteed by the Fourteenth Amendment.

VIII.
Plaintiffs request an interpretation of the term "master plan" as used in N.J.S.A. 40:55-1.1 et seq. They say it is necessary that they know the effect of the adoption of a master plan in order that they may properly protect their *275 interests. Further, they contend that the statute requires that a master plan should be interpreted to provide for the physical development of a municipality "within the limits of the existing zone plan."
Whatever merit may lodge in defendants' claim that plaintiffs have improperly joined this issue to the primary issue of the validity of the amendatory ordinance, no purpose is to be served by a consideration of the matter. The master plan issue is purely hypothetical. As observed by the trial judge, the township has under consideration but has not yet adopted a master plan for the whole township. The studies preparatory to the adoption of such a plan are still in progress. The question is therefore academic and premature.

IX.
Finally, plaintiffs attack the expenditure of funds appropriated for a master plan to pay for the Route 35 rezoning studies by the planning consultants. The 1956 township budget appropriated $7,500 for a "master plan." Plaintiffs claim that the contract with Community Planning Associates, Inc., binding the township to pay $17,500 for its services, was void because in excess of the appropriated amount, R.S. 40:2-29, and even if valid, the spending of the 1956 appropriation for the rezoning was unlawful.
We observe, in the first place, that studies of rezoning and future land use are peculiarly an important and necessary part of the work to be done in preparing a master plan. N.J.S.A. 40:55-1.1 and 1.11. Payment to the planning consultants in connection with their rezoning studies for Route 35 was not inconsistent with the ultimate comprehensive plan under contemplation. Moreover, the 1956 budget permitted the expenditure of monies up to $7,500, and there is no showing that anything in excess of this sum was paid out. Finally, the 1956 contract has since been replaced by one executed in 1957 with the help of a grant from the Planning Bureau of the State Department of Conservation and Economic Development.
*276 We note, incidentally, that the claim that the contract with Community Planning Associates, Inc., violates R.S. 40:2-29 because in excess of the appropriated amount was not raised in the complaint, amended complaint or in the pretrial order.

X.
This appeal projects, essentially, a difference in zoning policy between plaintiffs and the responsible township officials entrusted with zoning and planning powers. Plaintiffs would substitute their view for that of the constituted authorities, who have exercised their powers reasonably and conformably with the statute and the principles enunciated by our cases. The rezoning of Route 35 has been in accordance with a comprehensive plan, designed to promote the health, safety and general welfare of the township, and with every consideration given to the character of the area and the peculiar suitability of the lands along the highway for particular uses, with a view to conserving property values and encouraging the most appropriate use of land in the township.
Affirmed.